1            IN THE UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MISSOURI
2                   EASTERN DIVISION

3

4    ALISON DREITH,              )
                                 )
5           Plaintiff,           )
                                 )
6    v.                          ) Case No.
                                 ) 4:18-CV-01565-JCH
7    CITY OF SAINT LOUIS, et     )
     al.,                        )
8                                )
            Defendants.          )
9

10

     DEREK LANEY,                )
11                               )
            Plaintiff,           )
12                               )
     v.                          ) Case No.
13                               ) 4:18-cv-01575-CDP
     CITY OF SAINT LOUIS,        )
14   MISSOURI, et al.,           )
                                 )
15          Defendants.          )

16

17

18        VIDEO RECORDED ZOOM DEPOSITION OF

19            LIEUTENANT SCOTT BOYHER

20       TAKEN ON BEHALF OF THE PLAINTIFF

21              DECEMBER 8, 2020

22

23

24

25                    Exhibit A

LIEUTENANT SCOTT BOYHER  12/8/2020

```
 1                    I N D E X
                                              PAGE
 2    EXAMINATIONS
 3          Direct Examination by Mr. Wyrsch      7
 4
 5
 6    EXHIBITS
 7              (PLAINTIFF'S)
 8    Exhibit 1  Operations Plan              40
 9    Exhibit
      195        Video                       102
10
      Exhibit
11    196        Photograph                  105
12    Exhibit
      197        Photograph                  121
13
      Exhibit
14    198        Photograph                  125
15    Exhibit
      199        Video                       127
16
      Exhibit
17    200        IAD Complaint               140
18    Exhibit
      201        Video                       143
19
      Exhibit
20    202        Video                       147
21    (ALL EXHIBITS MARKED BY MR. WYRSCH)
22    (VIDEO EXHIBITS RETAINED BY MR. WYRSCH)
23    (EXHIBITS 196, 197, 198, 200 SENT TO PRODUCTION
24    BY MR. WYRSCH. EXHIBIT 1 WAS RETAINED BY COUNSEL.)
25
```

LIEUTENANT SCOTT BOYHER  12/8/2020

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MISSOURI
 2                    EASTERN DIVISION

 3
     ALISON DREITH,              )
 4                               )
            Plaintiff,           )
 5      v.                       )
                                 ) Case No.
 6   CITY OF SAINT LOUIS, et     ) 4:18-CV-01565-JCH
     al.,                        )
 7                               )
            Defendants.          )
 8

 9   DEREK LANEY,                )
                                 )
10          Plaintiff,           )
        v.                       )
11                               ) Case No.
     CITY OF SAINT LOUIS,        ) 4:18-cv-01575-CDP
12   MISSOURI, et al.,           )
                                 )
13          Defendants.          )

14      VIDEO RECORDED ZOOM DEPOSITION OF LIEUTENANT

15   SCOTT BOYHER, produced, sworn and examined on

16   December 8, 2020, at 711 North 11th Street, St.

17   Louis, Missouri 63101, appearing remotely before

18   Ashley C. Huelsmann, RPR, CSR(IL) and CCR(MO), in a

19   certain cause now pending in the United States

20   District Court, Eastern District of Missouri,

21   Eastern Division, between ALISON DREITH, Plaintiff,

22   vs. CITY OF SAINT LOUIS, et al., Defendants; DEREK

23   LANEY, Plaintiff, vs. CITY OF SAINT LOUIS, et al.,

24   Defendants, on behalf of the Plaintiffs.

25
```

LIEUTENANT SCOTT BOYHER  12/8/2020

```
 1                  A P P E A R A N C E S

 2

 3         FOR THE PLAINTIFFS (REMOTE):

 4             JAMES R. WYRSCH, ESQ.
               KIARA N. DRAKE, ESQ.
 5             KHAZAELI WYRSCH, LLC
               911 Washington Avenue, Suite 211
 6             St. Louis, MO 63101
               (314) 288-0777
 7

 8

 9         FOR THE DEFENDANTS:

               ABBY DUNCAN, ESQ.
10             BRANDON LAIRD, ESQ.
               CITY COUNSELOR'S OFFICE
11             CITY OF ST. LOUIS
               1200 Market Street, Room 314
12             St. Louis, MO 63103
               (314) 622-4694
13

14

15         VIDEOGRAPHER (REMOTE):

               JOHN NIEHAUS, CLVS
16             ALARIS LITIGATION SERVICES
               711 North Eleventh Street
17             St. Louis, MO 63101
               (314) 644-2191
18             (800) 280-3376

19

20         COURT REPORTER (REMOTE):

21             ASHLEY C. HUELSMANN, RPR
               CSR(IL)#084-004666, CCR(MO-1076)
22             ALARIS LITIGATION SERVICES
               711 North Eleventh Street
23             St. Louis, MO 63101
               (314) 644-2191
24             (800) 280-3376

25
```

LIEUTENANT SCOTT BOYHER  12/8/2020

```
 1            IT IS HEREBY STIPULATED AND AGREED by
 2   and between counsel for the Plaintiff and counsel
 3   for the Defendants that this video recorded Zoom
 4   deposition may be taken in shorthand by Ashley C.
 5   Huelsmann, a Registered Professional Reporter,
 6   Certified Shorthand Reporter (IL) and Certified
 7   Court Reporter (MO), and afterwards transcribed into
 8   typewriting; and the signature of the witness is
 9   expressly waived.
10   (DEPOSITION STARTED AT 9:34 A.M.)
11            VIDEOGRAPHER:  We're on the record.
12   Today's date is December 8th, 2020, and the time is
13   approximately 9:34 a.m.
14            This is the video recorded deposition
15   of Lieutenant Scott Boyher in the matters of Alison
16   Dreith verse City of Saint Louis, et al., Case
17   Number 4:18-CV-01565-JCH, and Derek Laney verse City
18   of Saint Louis, Missouri, et al., Case Number
19   4:18-cv-1575-CDP in the United States District
20   Court, Eastern District of Missouri, Eastern
21   Division.
22            This deposition is being held in remote
23   locations.  The reporter's name is Ashley Huelsmann.
24   My name is John Niehaus.  I'm the Legal
25   Videographer.  We are with Alaris Litigation
```

LIEUTENANT SCOTT BOYHER  12/8/2020

 1   Services.

 2              Will counsel please introduce yourself

 3   for the record?

 4              MR. WYRSCH:  James Wyrsch on behalf of

 5   Plaintiff, along with me is Kiara Drake.

 6              MS. DUNCAN:  Abby Duncan for

 7   Defendants, and along with me is Brandon Laird.

 8              VIDEOGRAPHER:  Would the court reporter

 9   please administer the remote stipulation and swear

10   the deponent?

11              COURT REPORTER:  My name is Ashley

12   Huelsmann, and I am a Registered Professional

13   Reporter, Certified Shorthand Reporter and Certified

14   Court Reporter.

15              This deposition is being taken

16   remotely, and those participating in this deposition

17   today are attending via video conference, with the

18   witness appearing at 711 North 11th Street, St.

19   Louis, Missouri 63101.

20              The attorneys participating in this

21   proceeding acknowledge their understanding that I am

22   not physically present with the witness and

23   acknowledge that, in lieu of an oath administered in

24   person, the witness will verbally declare their

25   testimony in this matter under penalty of perjury.

**LIEUTENANT SCOTT BOYHER  12/8/2020**

1   The parties and their counsel consent to this

2   arrangement and waive any objections to this manner

3   of proceeding.

4              Counsel, please indicate your agreement

5   verbally on the record by first stating your name

6   and that you stipulate to these terms, after which I

7   will swear in the witness and we may begin.

8              MR. WYRSCH:  James Wyrsch on behalf of

9   Plaintiff, we stipulate to those terms.

10             MS. DUNCAN:  Abby Duncan on behalf of

11   the Defendants and we so stipulate.

12             *     *     *     *     *

13             LIEUTENANT SCOTT BOYHER,

14   of lawful age, produced, sworn and examined on

15   behalf of the plaintiff, deposes and says:

16             THE WITNESS:  Yes.

17             THE CLERK:  Thank you, sir.

18                DIRECT EXAMINATION

19   BY MR. WYRSCH:

20        **Q.   Good morning.**

21        A.   Good morning.

22        **Q.   Can you go ahead and give your name for**

23   **the record?**

24        A.   Scott Boyher.

25        **Q.   And what is your current employer?**

LIEUTENANT SCOTT BOYHER  12/8/2020

```
 1              A.   I just answered that.  No.
 2              Q.   Well I asked you how, not who, so
 3     different question.  So you do not -- you do not
 4     know -- so -- so how was it -- how -- how was it
 5     presented to you -- I mean, you're the head of the
 6     bike team at that time, you're the lieutenant in
 7     charge of the bike team?
 8              A.   Yes.
 9              Q.   What -- what -- what are your -- what
10     are your general duties as the head of the bike team
11     non-protest related, what -- what do you -- what do
12     you do?
13              A.   The policing of downtown.
14              Q.   And how -- how many -- and in 2017 -- -
15     or say, 2016, how many team members were -- or how
16     many people did you have under your command?
17              A.   What was the date?
18              Q.   In 2016.  The fall of 2016.
19              A.   How many people did I have under my
20     command as the Bike Unit?
21              Q.   Was there -- was it -- let's talk about
22     the Bike Unit first, sure.
23              A.   The Bike Unit's, roughly, 25 people.
24              Q.   And it's been roughly 25 people now in
25     2016?
```

LIEUTENANT SCOTT BOYHER  12/8/2020

```
 1          A.   Some.
 2          Q.   But you -- you don't know why the
 3     person who's the main bike trainer was not part of
 4     the squad?
 5          A.   He was in a different assignment.
 6          Q.   Were there other bike trainers?
 7          A.   Yes.
 8          Q.   Who were they?
 9          A.   Adam Duke.
10          Q.   Anyone else?
11          A.   Nick Harbaugh, and that's it.
12          Q.   How do you spell that?
13          A.   Harbaugh -- H-A-R-B-A-U-G-H, I believe.
14          Q.   And they were trainers in 2016?
15          A.   I believe so.
16          Q.   Were they members of the bike squad?
17          A.   Harbaugh -- Nick Harbaugh was.
18          Q.   Adam Duke was not?
19          A.   Correct.
20          Q.   What did the Tiger Mountain Tactical
21     training consist of?
22          A.   Formations -- basically large crowd
23     management, formations.
24          Q.   What kind of formations?
25          A.   Separation formations, line formations,
```

LIEUTENANT SCOTT BOYHER  12/8/2020

```
 1    cross bow formations.
 2            Q.    How -- how many days was the training?
 3            A.    A week.
 4            Q.    When you say "a week", do you mean five
 5    days or seven days?
 6            A.    I believe it was five days.  It may
 7    have been four.
 8            Q.    40 --
 9            A.    Four or five days.
10            Q.    40 -- 40 hours, roughly?
11            A.    I don't recall.
12            Q.    How much of the time was done in class,
13    if any?
14            A.    No, there was plenty.  I don't recall.
15            Q.    Was it field training, as well?
16            A.    Yes.
17            Q.    Where did that occur?
18            A.    I believe it was in Forest Park.
19            Q.    And what do you remember about that
20    field training?
21            A.    It was going over BRT formations, how
22    to operate as a group.
23            Q.    Did you practice the formations?
24            A.    Yes.
25            Q.    What was your role in the training?
```

LIEUTENANT SCOTT BOYHER  12/8/2020

```
 1              A.   I don't recall.  I don't recall.
 2              Q.   What do you remember about the
 3    classroom training?
 4              A.   We've been through it so -- I don't
 5    remember the first time.  There's classroom training
 6    and then there's field exercise.
 7              Q.   What -- what -- if -- even if you don't
 8    remember the first time, the other times you've gone
 9    through it, what -- what kind of things are
10    discussed during the classroom time?
11              A.   How to hold formations, what people's
12    area of responsibility are, how to operate as a
13    team, what the -- different formations to use,
14    tactics to use, cross bow arrests.
15              Q.   Anything else you can remember?
16              A.   No.
17              Q.   What do you mean by "people's area of
18    responsibility"?
19              A.   If you're assigned to a line, then
20    you're a line officer.  And then you have
21    linebackers.  And if you have a sufficient amount of
22    manpower you'll have arrest teams behind them.
23              Q.   What is the role of a line officer in
24    the BRT?
25              A.   To form the line -- or --
```

LIEUTENANT SCOTT BOYHER  12/8/2020

1   there.

2         **Q.   Linebacker can decide for themselves to**
3   **make an arrest?**

4         A.   I'm sorry?

5         **Q.   A linebacker can decide for themselves**
6   **whether they want to make an arrest?**

7         A.   Yes.

8         **Q.   They don't need to consult the sergeant**
9   **or lieutenant?**

10        A.   If a linebacker is making an arrest,
11   they're not going to breach the line, it will be at
12   line.  So yes, they're able to do that.

13        **Q.   If someone -- if -- if there's a**
14   **decision to breach the line, does that have to be**
15   **made by a sergeant or a lieutenant?**

16        A.   Under most circumstances that would be
17   made by one of the supervisors.

18        **Q.   Between the training that you got in**
19   **advance of the presidential debate and the Stockley**
20   **protest, did the BRT conduct any additional**
21   **training?**

22        A.   I'm sure that we did, but I -- I don't
23   recall the dates.

24        **Q.   Where would that be recorded?**

25        A.   That may -- I don't believe there is an

LIEUTENANT SCOTT BOYHER  12/8/2020

```
 1           A.    That would be speculation on my part.
 2                 MR. WYRSCH:  Okay.  Why don't we take a
 3     ten-minute break?
 4                 VIDEOGRAPHER:  We're going off the
 5     record at approximately 10:46 a.m.
 6     (THERE WAS A BREAK.)
 7                 VIDEOGRAPHER:  We're back on the record
 8     at approximately 11:00 a.m.
 9     BY MR. WYRSCH:
10           Q.    Lieutenant Boyher, prior to the
11     Stockley protests in September of 2017, did BRT and
12     CDT ever train together?  Excuse me.
13           A.    We trained at the same locations, and
14     the BRT Unit would -- would assist the CDT team in
15     role-playing.  However, the two units don't
16     intermingle.
17           Q.    Tell me more about that.  What -- what
18     do you mean you trained -- you assist in
19     role-playing, but you don't co-mingle, I'm -- I
20     don't understand what you mean.
21           A.    The BRT Unit is a -- we don't have the
22     protective gear that the CDT team does.  So when a
23     CDT team is deployed it is usually deployed when
24     things have become more violent or it's anticipated
25     that things are going to decline.
```

LIEUTENANT SCOTT BOYHER  12/8/2020

```
1              The Bike Unit is -- primary's
2    responsibility is large crowd management, not civil
3    disobedience response.
4              So when we would train while the units
5    have relatively the same type of formations, we
6    don't intermingle with CDT because when CDT is out
7    the -- the BRT will pull -- pull out.
8         Q.   Yeah.
9         A.   We're not equipped with the protective
10   equipment.
11        Q.   When you said you did role-playing,
12   what do you mean?
13        A.   We will be -- the Bike Unit would be a
14   body of people that the CDT would practice on
15   moving, making arrests on, that type of thing.
16        Q.   Okay.  So they wouldn't be -- I assume
17   they wouldn't have their bikes with them at that
18   time?
19        A.   During --
20        Q.   When you're role-playing.
21        A.   Oh, in the role-playing, no.
22        Q.   Okay.  So they're -- they're basically
23   pretending to be civilians?
24        A.   Yes.
25        Q.   So is there -- was there ever any
```

1  training prior to Stockley where CDT and the Bike

2  Unit trained in tandem in any way, a coordinated

3  effort where the bike team's actually in their --

4  you know, had their bikes and doing formations in

5  that way?

6        A.   We'll be at the same locations doing

7  training, which are very similar.  Our roles are

8  different.

9        Q.   Okay.  You don't -- you don't practice

10 together?

11       A.   No.

12       Q.   So in the -- in the cases in which

13 you've testified, I just want to run through the

14 list of parties from -- from that weekend and ask

15 you if you -- if you are familiar with them, and

16 specifically were you familiar with them -- well,

17 we'll get into the when.

18            So when I say "familiar", meaning do

19 you -- do you know them personally, or had you heard

20 of them, or are you aware of who they are generally;

21 do you understand what I mean?

22       A.   Yes.

23       Q.   Okay.  So were you familiar with Fareed

24 Alston?

25       A.   No.

LIEUTENANT SCOTT BOYHER  12/8/2020

```
 1          Q.    Uh-huh.

 2          A.    -- so I -- I --

 3          Q.    So tell me -- tell me everything you

 4    remember about the buildup to this situation and her

 5    involvement in it.

 6          A.    The protestors -- the protest action

 7    they had surrounded the CDT buses, which I believe

 8    that there's a significant amount of film footage.

 9    They were throwing stuff at the buses.  I was given

10    an order to bring in the BRT to try to split the --

11    the crowd, so we could extract the buses out and

12    move out of the area.

13          Q.    Okay.  What does that have to do with

14    this photo?

15          A.    That's what we're doing.  We're -- we

16    have a line that we're trying to get up to that bus.

17    And the protestors were trying to stop the officers

18    from getting up there to get the buses out.

19          Q.    Where are the buses in relation to this

20    photo?

21          A.    They're over in front of the fire

22    department.

23          Q.    Which is south of this location?

24          A.    Yes.

25          Q.    Okay.  So this is Tucker and Clark?
```

LIEUTENANT SCOTT BOYHER  12/8/2020

```
 1    scene, or was this in an after video review -- an
 2    after video review?
 3             A.    It would have been later.
 4             Q.    Okay.  But you -- you -- the only
 5    person you were able to identify is Mr. Laney?
 6             A.    Yes.
 7             Q.    Did you issue a wanted for him?
 8             A.    I did not, one was issued for him.
 9             Q.    Okay.  What was the basis for the
10    wanted?
11             A.    He assaulted Sergeant Marks.
12             Q.    Was he ever charged with that or
13    arrested?
14             A.    He was placed as wanted.  I don't know
15    if he was arrested on it or not.
16             Q.    I'm going to show you what we're
17    marking as Exhibit 198.  Have you seen this picture
18    before?
19             A.    I don't think so.
20             Q.    Is this you (indicating)?
21             A.    That is me.
22             Q.    Okay.  Do you see all this spray around
23    here (indicating)?
24             A.    Yes.
25             Q.    Is that pepper spray?
```

LIEUTENANT SCOTT BOYHER  12/8/2020

```
 1            A.    I would assume so.

 2            Q.    Is that your pepper spray canister?

 3            A.    Yes.

 4            Q.    Is that Sergeant Marks?

 5            A.    Yes.

 6            Q.    Do you -- do you know -- do you know

 7    what the circumstances of what happened here are?

 8            A.    No, I don't recall.

 9            Q.    Do you know why you deployed pepper

10    spray at this time?

11            A.    I don't -- I don't recall -- I don't

12    recall the incident.

13            Q.    Okay.  So in these -- what -- why were

14    none of the people arrested contemporaneously that

15    -- that you sprayed?

16            A.    Why were none of the people arrested?

17            Q.    Yeah.

18            A.    We had a mission of extracting the

19    buses.  I could not lose any manpower to go arrest

20    people.  We needed every -- every available person

21    to get the buses out.

22            Q.    Were there CDT teams around?

23            A.    They were trapped on the bus at one

24    point.

25            Q.    All of them?
```

LIEUTENANT SCOTT BOYHER  12/8/2020

 1   interviewed.

 2           **Q.   I'm going to show you what we've marked**

 3   **as Exhibit 201.  Do you see the exhibit?  Do you see**

 4   **that video?**

 5           A.   I see a picture.

 6           **Q.   Yep.  This is the bus again that we've**

 7   **been describing?**

 8           A.   That's one of them.  I don't know if

 9   that's the first or the second one.

10           **Q.   Okay.  All right.  Now, Mr. Laney here**

11   **(indicating).  Is that Marks?**

12           A.   Yes.  We keep -- the segment where

13   they're fighting, you just missed.

14           **Q.   Well, I mean I didn't take this video,**

15   **I take them as they come.**

16           A.   Okay, okay, okay.

17           **Q.   I'll play it back for you, the whole**

18   **thing.  It's not very long.  Okay.  I'm slowing it**

19   **down for you.  I mean, this is Marks (indicating),**

20   **right?**

21           A.   Uh-huh.

22           **Q.   This is Mr. Laney (indicating)?**

23           A.   Uh-huh.

24           **Q.   There's space between them?**

25           A.   Yeah.

LIEUTENANT SCOTT BOYHER  12/8/2020

 1   evident with the other photographs that we looked

 2   at.

 3          Q.   Okay.  But do you see anything in here

 4   that's blocking as you said before from getting to

 5   the bus?

 6          A.   In that snapshot, no.

 7          Q.   In the video we just watched.

 8          A.   No, but I don't know what occurred

 9   before then.

10          Q.   Okay.  Do you see the woman in purple

11   here?

12          A.   Yeah, I see a -- is that -- yeah, an

13   elderly woman or a man, yeah.

14          Q.   No, it's the same woman we were looking

15   at before.  And the woman with the pink hair.  So

16   I'm trying to understand where in this video you're

17   being prevented from getting to the bus.

18          A.   You're bouncing through, can you go

19   back and --

20          Q.   I'll go to the beginning.

21          A.   There's something going on right here

22   where they're blocking - -part of the BRT has made

23   it through, part of them are being stopped somehow

24   by -- by people.

25          Q.   That's your -- your position is that

LIEUTENANT SCOTT BOYHER  12/8/2020

1    that these people were able to make it through, but

2    others were --

3            A.   Correct.

4            Q.   -- civilians were blocking police

5    officers from getting where they're going?

6            A.   To the best of my memory, that's what I

7    remember, yeah.

8            Q.   I mean, where along this line here are

9    people blocking them?

10           A.   Well, right there in that -- in that

11   shot there isn't.

12           Q.   Okay.  And now you see Mr. Laney here.

13   Do you recognize anyone in these -- in this line

14   right here (indicating)?

15           A.   Not by the tape right here, I can't.  I

16   know Mike Marks and Ben Bayless were up here in the

17   front.  I can't --

18           Q.   Do you know --

19           A.   -- we're jumping around --

20           Q.   -- who this is (indicating)?

21           A.   Oh, that's Marks, that's Marks there.

22           Q.   Okay.  And that's you?

23           A.   Yes.

24           Q.   So what -- what did -- what did you

25   witness?

LIEUTENANT SCOTT BOYHER  12/8/2020

1    it's to push him out of the way of the bus.  When I
2    reached them, they were fighting and I maced -- and
3    I maced Landy -- Laney.
4         **Q.   Right here, I know it's fuzzy, but Mr.**
5    **Laney is going backwards.**
6         A.   Right they've already been fighting, I
7    don't know what's --
8         **Q.   Whoever this -- whoever is -- are you**
9    **fast forwarding where we're missing this?**
10        A.   I'm not -- I didn't create the -- I'm
11   playing it in realtime.
12        **Q.   Oh, okay.**
13        A.   I'm sorry, it looks like you're fast
14   forwarding it.
15        **Q.   No, I'm -- I'm -- someone else is**
16   **moving it around.**
17        A.   Okay.  He has -- he has Marks's bike at
18   one point, they're fighting.  That's Ben Bayless.
19   At one time he had a hold of his bike.  I didn't
20   witness that.  He just kicked -- kicked his bike
21   right there.
22        **Q.   Well, who -- who is Ben Bayless, this**
23   **person (indicating)?**
24        A.   That little guy.
25        **Q.   That's Ben Bayless?**

LIEUTENANT SCOTT BOYHER  12/8/2020

```
 1   at approximately 2:32 p.m.

 2   BY MR. WYRSCH:

 3        Q.   All right.  So I'm going to show you

 4   what we've marked as Exhibit 202, which for the

 5   record is video City 02010, Tucker and Market, 2017,

 6   9/15.  Do you recognize this video?

 7        A.   No.

 8        Q.   All right.  So this is I'll represent

 9   to you the Real Time Crime Center version.  And let

10   me get my little pointer.  What are the officers

11   doing right there?

12        A.   I'm -- I'm not up there.  I -- I can't

13   tell if that's the front of the bus or it's the back

14   of the bus.

15        Q.   Oh, hold on.  We're starting -- I'm

16   going to start at the 1:33:08 mark in the video.  So

17   these are the people that are sort of blocking the

18   bus; is that right?

19        A.   Yes.

20        Q.   And then what is -- how are you -- what

21   was the -- what was the order of how to get them to

22   move?

23        A.   The -- we were going to form a

24   formation, give everybody verbal direction to get --

25   you know, as you get up there, move off the bus, and
```

LIEUTENANT SCOTT BOYHER  12/8/2020

```
 1   then escalate at -- to whatever we have to do.
 2   We're trying to get the bus out.
 3         Q.   Okay.  So these are -- these are the
 4   bike officers coming up?
 5         A.   Those are bike officers.
 6         Q.   All right.  Does that look like
 7   verbal --
 8         A.   Yeah, they're -- that whole group is
 9   screaming move.
10         Q.   Do you -- do you think that was -- do
11   you think that they gave them an opportunity to
12   comply with that?
13         A.   Yes.  The majority of them are moving.
14         Q.   I'll point out here that's Mr. Laney.
15   Do you happen to know who this would be
16   (indicating)?
17         A.   I can't tell.  I can't even tell that's
18   Mr. Laney.
19         Q.   Okay.  And then you see how the officer
20   --
21         A.   Oh, yeah --
22         Q.   -- pushes the bike towards him?
23         A.   No, I think he's grabbing the bike.
24         Q.   Really?  Okay.
25         A.   Yeah.
```

LIEUTENANT SCOTT BOYHER  12/8/2020

```
 1          Q.   So is that what you're talking about
 2   when the -- so do you -- do you know if this is
 3   Marks, or is this someone else?
 4          A.   I don't know, I can't tell.
 5          Q.   I'll just play it.
 6          A.   Yeah, that would be Marks, he had
 7   chevrons on, yes.
 8          Q.   Okay.  That's you right there
 9   (indicating)?
10          A.   Yes.  And Laney has got a hold of that
11   bike when I spray him.
12          Q.   He has a hold of the bike when you're
13   spraying him?
14          A.   He either -- he either has a hold or
15   just -- they're actively fighting.  You can see
16   where he's got the bike here.  I don't know if his
17   hands were on the bike when I sprayed him, I don't
18   -- or off the bike.  He's obviously fighting with
19   officers.  We're trying to extract a bus.
20          Q.   Okay.  So just for the record, we're at
21   1:34:03, and then there's -- they -- someone --
22   somehow that bike goes towards Mr. Laney --
23          A.   Yeah, you can see them both tugging
24   over the bike.
25          Q.   All right.  Well, we're at 1:34:14.
```

LIEUTENANT SCOTT BOYHER  12/8/2020

```
 1          A.   Uh-huh.
 2          Q.   That's 11 seconds that have elapsed?
 3          A.   Uh-huh.
 4          Q.   And you're saying in that time they
 5    were tugging over the bike and there was a fight?
 6          A.   Yes, they're fighting over that bike
 7    right there.
 8          Q.   And that's the reason that you pepper
 9    sprayed him?
10          A.   Yes, he's -- he's interfering with the
11    officers.  He's being assaulting and he's
12    interfering with the officers, too, for extracting
13    the bus, yes, that's why he was sprayed.
14          Q.   What -- what -- how is he interfering?
15          A.   I think it shows right there on the
16    tape, he's in the middle of the BRT ling fighting
17    with a sergeant over his bike.  And we're bringing
18    that bus --
19          Q.   So it's your contention -- it's your
20    contention that this depicts him fighting, and
21    that's -- and that's the interference?
22          A.   Yes.
23          Q.   Is it possible that he came up to them
24    to talk to them and the officer used his bike to
25    push him away?
```