```
 1              IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF MISSOURI
 2                      EASTERN DIVISION

 3

 4    DEREK LANEY,

 5         Plaintiff,

 6    vs.                         Case No.  4:18-CV-1575-CDP

 7
      CITY OF SAINT LOUIS, etc., et al.,
 8
           Defendants.
 9

10

11

12

13

14
           VIDEORECORDED VIDEOCONFERENCED DEPOSITION
15                      OF MICHAEL MARKS
                       JANUARY 21, 2021
16

17

18

19

20

21

22

23
                                    Exhibit C
24

25
```

```
 1                        I N D E X

 2                        WITNESSES

 3   All Witnesses:                                Page

 4   Michael Marks
       Examination by Mr. Wyrsch                      6
 5     Examination by Ms. Dierker                   110

 6

 7                        EXHIBITS

 8   Exhibit 196      Photograph                     61

 9   Exhibit 197      Photograph                     61

10   Exhibit 199      Video                          64

11   Exhibit 214      Incident Report                80

12   Exhibit 215      Video                          73

13   Exhibit 216      Screenshot                     66

14
     (The Exhibits 196, 197, 199, 214 and 215 were
15   retained by Mr. Wyrsch.  The original Exhibit 216
     was sent electronically to the reporter and copies
16   will be provided as requested.)

17

18

19

20

21

22

23

24

25
```

```
 1            IN THE UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MISSOURI
 2                    EASTERN DIVISION

 3

 4   DEREK LANEY,

 5        Plaintiff,

 6   vs.                        Case No.  4:18-CV-1575-CDP

 7
     CITY OF SAINT LOUIS, etc., et al.,
 8
          Defendants.
 9

10

11            VIDEORECORDED VIDEOCONFERENCED

12   DEPOSITION OF MICHAEL MARKS, produced, sworn, and

13   examined on JANUARY 21, 2021, between the hours of

14   eight o'clock in the forenoon and six o'clock in

15   the afternoon of that day, with all parties

16   appearing remotely, before Tammie A. Heet, a

17   Registered Professional Reporter, Certified

18   Shorthand Reporter and Notary Public within and for

19   the states of Illinois and Missouri, in a certain

20   cause now pending in the United States District

21   Court, Eastern District of Missouri, Eastern

22   Division in re:  Derek Laney vs. City of Saint

23   Louis, etc., et al.,; on behalf of the Plaintiff.

24

25
```

```
 1                    APPEARANCES
 2
 3   For the Plaintiff:
 4        Mr. James Wyrsch, Esq.
          KHAZAELI WYRSCH LLC
 5        911 Washington Avenue, Suite 211
          St. Louis, Missouri  63101
 6        314/288-0777
          james.wyrsch@kwlawstl.com
 7
 8   For the Defendants:
 9        Ms. Catherine Dierker, Esq.
          Mr. Adriano Martinez, Esq.
10        CITY COUNSELOR'S OFFICE
          1200 Market Street, 3rd Floor
11        St. Louis, Missouri  63103
          314/622-3361
12        dierkerc@stlouis-mo.gov
13
     Reported and Videorecorded By:
14
          Ms. Tammie A. Heet, RPR, CSR(IL), CCR(MO)
15        Mr. Oleh Kovalchuke
          ALARIS LITIGATION SERVICES
16        711 North 11th Street
          St. Louis, Missouri 63101
17        314/644-2191
18
19
20
21
22
23
24
25
```

```
 1              IT IS HEREBY STIPULATED AND AGREED by
 2   and between counsel for the Plaintiff and counsel
 3   for the Defendants that this deposition may be
 4   taken in shorthand by Tammie A. Heet, RPR, CSR, CCR
 5   and notary public, and afterwards transcribed into
 6   printing, and signature by the witness expressly
 7   reserved.
 8                      *  *  *  *  *
 9              THE VIDEOGRAPHER:  We're on the
10   record.  Today's date is January 21st, 2021, and
11   the time is 1:33 p.m.  This is the videorecorded
12   deposition of Michael Marks.
13              The reporter will now read the
14   stipulation and swear in the witness.
15              THE REPORTER:  This is Tammie Heet
16   and I am a Certified Court Reporter.  This
17   deposition is being taken remotely, with the
18   witness appearing from St. Louis, Missouri.
19              All attorneys understand that I am
20   not physically present with the witness and that I
21   will not be administering the oath in person.  The
22   parties and counsel consent to this arrangement and
23   waive any objections to this manner of proceeding.
24              Counsel, please indicate your
25   agreement verbally on the record by stating your
```

```
 1   name and that you stipulate to these terms, after
 2   which I will swear in the witness and we may begin.
 3              MR. WYRSCH:  James Wyrsch on behalf
 4   of Plaintiff, we stipulate.
 5              MS. DIERKER:  Catherine Dierker on
 6   behalf of Defendant agrees to those terms.
 7                     * * * * *
 8                   MICHAEL MARKS,
 9   of lawful age, produced, sworn, and examined on
10   behalf of Plaintiff, deposes and says:
11                     EXAMINATION
12   QUESTIONS BY MR. WYRSCH:
13        Q.   Good afternoon.  Can you state your
14   name for the record?
15        A.   Mike Marks.  Michael Marks.
16        Q.   And I'm guessing by your attire that
17   you're still a member of the St. Louis Metropolitan
18   Police Department?
19        A.   I am.
20        Q.   How long have you been an officer
21   with the department?
22        A.   33 years.
23        Q.   How long have you been a sergeant?
24        A.   24.
25        Q.   Have you ever been -- were you a
```

```
 1          Q.    Why do you say that?
 2          A.    I think it would be foolish on the
 3    City to announce a verdict of something that could
 4    cause potential protests and not have officers on
 5    standby.
 6          Q.    So you think there was some
 7    coordination between the court and the police on
 8    the timing of the verdict?
 9          A.    My opinion, yes.
10          Q.    What -- what is the first thing you
11    remember about the 15th and your activities that
12    day as -- as it relates to the protest?
13          A.    Responding to the area of where the
14    old police headquarters is at -- what is that --
15    Tucker and Clark or Tucker and Market and seeing
16    the crowds of people in the street by the
17    courthouse.
18          Q.    Okay.  And what did -- what did --
19    the BRT team, what was their role in the beginning?
20          A.    I guess our initial role was just to
21    monitor.
22          Q.    And do you remember where you were
23    monitoring from?
24          A.    I do not, sir.
25          Q.    And what do you remember next?
```

```
 1           A.    Well, specifically, I remember
 2    someone getting on the air -- over our air, saying
 3    that they need the bikes to respond to Tucker and
 4    Clark to help extract some buses that had CDT team
 5    officers on them, that the group of protesters were
 6    surrounding the buses, preventing them from
 7    leaving.
 8           Q.    Do you remember who gave that order?
 9           A.    I do not, sir.
10           Q.    And the time that that order came
11    over, what were you doing?
12           A.    I do not recall, sir.
13           Q.    Do you remember where you were?
14           A.    I do not.
15           Q.    Okay.  Do you remember how you
16    responded?
17           A.    Obviously, I responded on my bike,
18    and maybe it was -- I do recall traveling
19    southbound.  So we might have been up in the area
20    of Market and Tucker near Firemen's Park, which is
21    on the northwest corner of Tucker and Market.  And
22    I remember responding southbound to get to the
23    buses.
24           Q.    Okay.  At any point do you remember
25    being on Clark east of Tucker?
```

```
 1   to the buses --
 2         A.    Yes.
 3         Q.    -- and the time that you traveled
 4   down Tucker to the point where you actually got to
 5   the buses, do you remember anything notable
 6   happening?
 7         A.    I mean, there were groups of crowds
 8   that were yelling disparaging remarks at us as we
 9   were going by.  Just the crowd seemed to be very
10   unruly, agitated.  Other than that, no.  Nothing
11   specifically.
12         Q.    Did anyone in those crowds attempt to
13   impede your ability to get to the buses?
14         A.    Oh, yeah.  They would stand in our
15   way.  They would -- yeah.  The typical, "Oh, why do
16   I have to move, this is a public street," that --
17   that type of shenanigans.
18         Q.    Let me be -- let me be more specific
19   then.  With -- did anyone lock arms and try to stop
20   the bike team from going down Tucker?
21         A.    Oh, yeah, they did.
22         Q.    How many people?
23         A.    Oh, I don't know.  There were small
24   groups.  You know, there might have been groups of
25   ten doing it and groups of three or four doing it.
```

1   I -- I know when I was riding down, we came in --
2   in front of a group of maybe 15 to 20 that had -- I
3   don't know specifically if they were locking arms
4   or holding hands together, but they were obviously
5   trying to prevent our free flow down Tucker.
6         Q.    **Where was that?**
7         A.    I want to say it was on Tucker
8   probably around -- just north of Clark or in the
9   intersection of Clark.  It's hard to recall exactly
10  where.
11        Q.    **Okay.  Did they actually impede your**
12  **movement?**
13        A.    Yes, they did.
14        Q.    **For how long?**
15        A.    I don't know, sir.  Probably -- it
16  seemed like a long time then, but it was probably
17  15 seconds, 10 seconds until some officers were
18  able to break -- break through the line.
19        Q.    **All right.  And how were they able to**
20  **break through the line?**
21        A.    You know, by taking their bikes and
22  ordering the people to separate and taking their
23  bikes and sort of forcing them apart by pushing
24  their bikes through, as I recall.
25        Q.    **Okay.  But you don't think you were**

```
 1   we disseminate that information to the officers so
 2   the officers are well aware of any policy changes.
 3        Q.   Okay.  How do you disseminate that
 4   information?
 5        A.   Roll call, I'll read the Special
 6   Order over to them and ask them if anyone
 7   understands and are there any questions.  And if I
 8   can't answer a question, I'd go to somebody that
 9   could.
10        Q.   Okay.  Do you keep any sort of
11   records of those types of interactions at the roll
12   call?
13        A.   Not specifically the roll calls, no,
14   sir.  But we do have a use of force policy and
15   pursuit policy that gets reviewed every month.
16        Q.   Okay.  What is that?
17        A.   It's basically you read over the
18   Special Order, and then there's usually a three- to
19   four-question test that follows the test.  And you
20   have to successfully pass the test to be certified
21   or -- or to acknowledge that you understood the
22   order and that you -- you reviewed it for the
23   month.
24        Q.   And is there -- you said there's
25   information about use of force on that test?
```

```
 1        A.    There is.
 2        Q.    Okay.  And what kind of subjects do
 3   they cover as far as the use of force?
 4        A.    Well, the Special Order, you're
 5   supposed to review it.  It covered basically the
 6   whole spectrum of the use of force from command
 7   presence to verbal commands, all the way up to --
 8   through and to include deadly force.
 9        Q.    So do you remember what the questions
10   were on the last test?
11        A.    Somewhat.
12        Q.    Okay.  What do you remember?
13        A.    There was one question that pertains
14   to when use of force is used on a subject, that he
15   has to be offered medical attention if he's
16   arrested.  And -- you know, and it's basically true
17   and false and -- and multiple choice.
18              There's one that pertains to the --
19   you know, when a -- when arresting a subject --
20   this is the correct answer.  This is what I'm
21   saying that I know.  When arresting a subject, an
22   officer should use the least amount of force
23   necessary to effect that arrest.  That is one of
24   the answers in a multitude of possible answers.  So
25   it's multiple choice.  It's true or false, that
```