UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DEREK LANEY,                              )
                                          )
          Plaintiff,                      )
                                          )
     v.                                   )          Case No. 4:18 CV 1575 CDP
                                          )
CITY OF ST. LOUIS, MISSOURI,              )
et al.,                                   )
                                          )
          Defendants.                     )

## MEMORANDUM AND ORDER

Plaintiff Derek Laney claims that during peaceful protest activity following

the September 15, 2017, verdict in *State of Missouri v. Stockley*, defendant Scott

Boyher, a lieutenant with the St. Louis Metropolitan Police Department

(SLMPD),[1] sprayed him in the face with pepper spray without warning and with no

attempt to arrest him.  Laney brings this civil rights action under 42 U.S.C. § 1983

against Boyher alleging violations of his First and Fourth Amendment rights, and

against the City of St. Louis alleging municipal liability for Boyher's unlawful

actions.  Laney also brings supplemental State-law claims against Boyher and the

City, alleging assault, battery, and negligent and intentional infliction of emotional

distress.  Finally, Laney brings a novel claim based on the St. Louis City Charter

---

[1] The St. Louis Metropolitan Police Department is a department of the City of St. Louis.

against then-acting Chief of Police Lawrence O'Toole and Director of Public
Safety Charlene Deeken, alleging that they are vicariously liable for both the §
1983 and the State-law violations committed by Boyher.  All defendants move for
summary judgment on Laney's claims.  For the reasons that follow, I will grant the
motion on Laney's constitutional claims and dismiss those claims with prejudice.  I
will decline to exercise supplemental jurisdiction over Laney's remaining State-
law and City-Charter claims and dismiss those claims without prejudice.

## Background

Viewed in a light most favorable to plaintiff Laney, the evidence before the
Court shows the following facts:

On September 15, 2017, the St. Louis City Circuit Court issued its findings
and verdict in *Stockley*, acquitting a SLMPD officer of murder in the shooting
death of Anthony Lamar Smith.  The verdict prompted some members of the
public to engage in protest activity around the St. Louis metropolitan area,
including within the City of St. Louis.  Plaintiff Laney joined the protest activity
on September 15 in downtown St. Louis.

During the afternoon of September 15, Civil Disobedience Teams (CDTs) of
the SLMPD were staged at the Police Academy building located on Tucker
Boulevard in downtown St. Louis.  The SLMPD brought buses to this site,
intending to remove the CDTs from the area in order to prevent the protest from

escalating.  After the CDTs loaded onto the buses, groups of protesters began to

surround the buses and prevented them from leaving.  Some of the protesters

locked arms and stood in front of the buses.  Some protesters threw objects at the

buses.  The SLMPD called in the Bicycle Response Team (BRT) to assist in

extricating the buses from in front of the Police Academy on Tucker.  At the time,

BRT officers were located a few blocks further north on Tucker.  Defendant

Boyher was the commander of the BRT.

The record contains cell phone videos, Go-Pro video, and an excerpt of a

Real-Time Crime Center (RTCC) video.  When viewed *in toto*, these videos –

recorded from different angles – capture the events giving rise to Laney's claims.

The record also contains aerial videos that capture other protest activity and law

enforcement's responses thereto.

Video footage shows a city bus on Tucker facing north with roughly 20 to

25 protesters locked arm-in-arm standing in front of the bus.  Approximately seven

BRT officers arrive from the north and attempt to remove the protesters from in

front of the bus.  With the arrival of about 13 more BRT officers, the officers form

a wedge in front of the bus to clear a path for the bus to exit the area.  To form this

wedge, the BRT officers first raise and hold their bicycles in front of them and use

the bicycles to direct and keep protesters away from the bus while repeatedly

shouting "move back."  The officers then form two lines in front of the bus (one

line facing east, the other facing west) with officers in each line standing with their bicycles on the ground tire-to-tire, forming a bicycle fence of sorts to prevent protesters from approaching the front of the bus and to keep the bus's exit path on Tucker clear.  In one video, Laney is seen walking around the north end of the east-facing BRT fence line and making his way into the otherwise cleared path in front of the bus.  Laney avers that he approached the officers to complain to them about their treatment of the female protesters, and specifically what he perceived to be the BRT's use of the bicycles to assault the women.  Video footage shows that as Laney neared the back of an officer in the west-facing BRT line, an officer from the east-facing line – later identified as Sgt. Michael Marks – moved with his bicycle toward Laney across the otherwise cleared path, stood in front of Laney, and raised his bicycle.  There is no dispute, and video footage shows, that Laney and Marks then engaged in a physical altercation with the bicycle raised between them.  Laney testified at deposition that Marks pushed his bicycle into him; Marks testified at deposition that Laney grabbed and wrestled with the bicycle and eventually shoved it back into him.

This altercation lasted five seconds.  Laney then dropped his hands to his side and began to step back from Marks but not away from the BRT lines.  As Laney stepped back, Marks walked in tandem with and toward Laney, with his bicycle raised.  Marks and Laney continued to be face-to-face, and Laney was

shouting at Marks.  While this was occurring, Boyher approached the scene from behind and to the right of Laney and shouted something at Laney.  When Laney turned toward Boyher, Boyher sprayed Laney in the face with pepper spray from a high-capacity "fogger."  Five seconds had elapsed from the time Laney dropped his hands to his side to when Boyher sprayed him with pepper spray.  After being sprayed, Laney walked away from the BRT lines and the bus began to move away from the area.  Bystanders immediately assisted Laney by pouring water into his eyes and removing him from the scene.

Laney claims that Boyher did not give any warning before spraying him with pepper spray nor made any attempt to arrest him.  Laney also claims that he was not engaged in any unlawful behavior that required the use of pepper spray and that there was no danger to life or property when Boyher sprayed him.  Laney makes no claim against Marks; nor does he make the bicycle incident itself the basis of any claim.

Laney filed this action on September 17, 2018.  In an eight-count Second Amended Complaint filed February 13, 2020, Laney asserts the following claims under 42 U.S.C. § 1983:  that Boyher violated his First and Fourteenth Amendment rights to freedom of speech, freedom of assembly, and freedom of the press (Count 1); that Boyher violated his Fourth and Fourteenth Amendment right to be free

from excessive use of force (Count 6); and that the City is liable under *Monell*[2] because the violations of his civil rights were caused by a policy, practice, or custom of the City and by its failure to train, discipline, and supervise its police officers (Count 2).  Laney brings supplemental State-law claims against both Boyher and the City, alleging that the use of pepper spray in the circumstances here constituted assault (Count 3) and battery (Count 7); and that the use of pepper spray in the circumstances constituted intentional infliction of emotional distress (Count 4) or, alternatively, negligent infliction of emotional distress (Count 5). Finally, Laney brings a novel claim against defendants O'Toole and Deeken, alleging that they are vicariously liable for Boyher's actions under the terms of St. Louis City's Charter (Count 8).  As relief, Laney seeks compensatory damages, attorney's fees, expenses, and costs on his § 1983 claims; and punitive damages on his State-law claims.

Defendants assert that they are entitled to summary judgment on the following grounds:  1) that Boyher is entitled to qualified immunity on the claims raised in Counts 1 and 6 alleging that he violated Laney's First and Fourth Amendment rights; 2) that there is no evidence to support Laney's *Monell* claim against the City; 3) that Laney's State-law claims against Boyher are barred by the doctrine of official immunity; and 4) that Laney's State-law claims against the City

---

[2] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

are barred by sovereign immunity.  Defendants also seek to dismiss the claim

raised against O'Toole and Deeken in Count 8, arguing that the Court should not

exercise supplemental jurisdiction over this novel claim brought under the City

Charter.

Additional facts are set forth below as relevant to specific claims.

**Legal Standard**

Summary judgment must be granted when the pleadings and proffer of

evidence demonstrate that no genuine issue of material fact exists and that the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a);

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Torgerson v. City of

Rochester,* 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).  I must view the

evidence in the light most favorable to the nonmoving party and accord him the

benefit of all reasonable inferences.  *Scott v. Harris,* 550 U.S. 372, 379 (2007).

The moving party bears the burden of showing both the absence of a genuine issue

of material fact and its entitlement to judgment as a matter of law.  Fed. R. Civ. P.

56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Celotex Corp.*,

477 U.S. at 322.  Where sufficient evidence exists to support a factual dispute, a

jury must resolve the differing versions of truth at trial.  *Anderson*, 477 U.S. at

248-49.

At the summary judgment stage, courts do not weigh the evidence and

decide the truth of the matter, but rather determine if there is a genuine issue for

trial. *Anderson*, 477 U.S. at 249. However, summary judgment may be

appropriate "[w]hen opposing parties tell two different stories, one of which is

blatantly contradicted by the record, so that no reasonable jury could believe it[.]"

*Scott*, 550 U.S. at 380. In such circumstances, the mere existence of some alleged

factual dispute will not serve to defeat summary judgment; instead, the factual

dispute must be "genuine." *Id.*

## Discussion

### A.   Qualified Immunity

Qualified immunity shields Boyher from civil damages liability if his

conduct does not violate "clearly established statutory or constitutional rights of

which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S.

800, 818 (1982); *Quraishi v. St. Charles Cnty., Mo.*, 986 F.3d 831, 835 (8th Cir.

2021). A two-step inquiry applies to a qualified-immunity defense: 1) whether the

plaintiff has alleged facts to show a violation of a constitutional right, and 2)

whether that right was clearly established at the time of the alleged misconduct.

*Quraishi*, 986 F.3d at 835 (citing *Smith v. Kansas City Police Dep't*, 586 F.3d 576,

580 (8th Cir. 2009)). I may consider either prong first. *Id.* If the answer to either

question is no, then the defendant is entitled to qualified immunity. *Baude v. City

of St. Louis*, 476 F. Supp. 3d 900, 909 (E.D. Mo. 2020) (citing *Doe v. Flaherty*,

- 8 -

623 F.3d 577, 583 (8th Cir. 2010)).

Laney has the burden to show that the right was clearly established at the time of the alleged violation. *Quraishi*, 986 F.3d at 835 (citing *Davis v. Scherer*, 468 U.S. 183, 197 (1984)). To be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would [have understood] that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The state of the law at the time of the alleged violation – whether articulated by precedent, controlling authority, or a robust consensus of cases of persuasive authority – must give officials fair warning that their conduct is unlawful. *Quraishi*, 986 F.3d at 835. "There may also be the 'rare 'obvious case' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)).

### 1.     *Count 6 – Fourth Amendment, Excessive Force*

To defeat the defense of qualified immunity in the context of a Fourth Amendment excessive force claim, a plaintiff must demonstrate that his right to be free from the defendant's particular use of force was clearly established at the time of the incident. *Shelton v. Stevens*, 964 F.3d 747, 753 (8th Cir. 2020). "Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Even where

an officer's action is deemed unreasonable under the Fourth Amendment, he is entitled to qualified immunity if a reasonable officer could have believed, [even] mistakenly, that the use of force was permissible[.]" *Id.* (internal quotation marks and citation omitted).  "'Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.'" *Jacobsen v. Klinefelter*, 992 F.3d 717, 721 (8th Cir. 2021) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam)).  While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular action beyond debate.  *Shelton*, 964 F.3d at 753.  "A plaintiff need not show that the very action in question has been previously been held unlawful, but he must establish that the unlawfulness was apparent in light of preexisting law." *Ellison v. Lesher*, 796 F.3d 910, 914 (8th Cir. 2015) (internal quotation marks and citation omitted).

At the time of the use of force here, Boyher was responding to a physical altercation that he witnessed between a BRT officer and Laney in an area that had been cleared by the BRT.  There is no dispute that from his vantage point, that is, approaching the scene from behind Laney, Boyher saw Marks' bicycle up in the air and continued engagement between Marks and Laney (Boyher Depo., ECF 93-1 at header p. 26), which is consistent with the video footage of record.  There also is

- 10 -

no dispute that from his vantage point, Boyher believed that Marks and Laney continued to actively fight when he pepper sprayed Laney.  (*Id.* at header p. 23-26.)  On these facts, a reasonable officer would have believed that the force Boyher used here was permissible.  *See Jacobsen*, 992 F.3d at 722 (not unreasonable to deploy pepper spray after plaintiff shoved deputy and physically resisted deputy's efforts to remove him from premises); *cf. Baude*, 476 F. Supp. 3d at 913 (qualified immunity denied on officers' use of pepper spray where there is no indication that plaintiff posed an immediate threat to the officers' safety).  That Boyher learned after viewing video taken from a different angle that Marks and Laney had just disengaged (*see* ECF 93-1 at header p. 26) demonstrates that he was mistaken, but it does not make his initial action unreasonable in the circumstances.  *See Stanton v. Sims*, 571 U.S. 3, 6 (2013) (per curiam) (qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments"); *Saucier v. Katz*, 533 U.S. 194, 206 (2001) (qualified immunity can apply in the event the mistaken belief was reasonable).

Accordingly, defendant Boyher is entitled to qualified immunity on Laney's claim that his use of pepper spray constituted excessive force in violation of the Fourth Amendment.

2. *Count 1 – First Amendment*

"A citizen's right to exercise First Amendment freedoms without facing

- 11 -

retaliation from government officials is clearly established." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010) (internal quotation marks and citation omitted).  *See also Hartman v. Moore,* 547 U.S. 250, 256 (2006) ("[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out."); *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014).  To establish a First Amendment claim of retaliation under § 1983, the plaintiff must show:  "'(1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity.'"  *Burbridge v. City of St. Louis, Mo.*, 2 F.4th 774, 781 (8th Cir. 2021) (quoting *Peterson*, 754 F.3d at 602).  Under the third prong, a plaintiff must show that retaliatory animus was a "substantial factor" or "but-for cause" of the adverse action.  *Baribeau*, 596 F.3d at 481.  "In other words, the plaintiff must show he was singled out because of [his] exercise of constitutional rights."  *Peterson*, 754 F.3d at 602 (internal quotation marks and citation omitted) (alteration in *Peterson*).  *See also Hartman,* 547 U.S. at 256; *Baribeau*, 596 F.3d at 481.

      a.     Freedom of Speech

It is beyond debate that at the time of the alleged misconduct here, the First

Amendment applied to citizens exercising their rights to criticize police conduct.

*City of Houston, Tex. v. Hill*, 482 U.S. 451, 462-63 (1987) ("The freedom of individuals verbally to oppose or challenge police action . . . is one of the principal characteristics by which we distinguish a free nation from a police state.").  The law was settled that the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for speaking out.  *Thurairajah v. City of Fort Smith, Ark.*, 925 F.3d 979, 985 (8th Cir. 2019) (citing *Hartman*, 547 U.S. at 256).  Criticism of law enforcement officers, even with profanity, is protected speech.  *Id.* (citing *City of Houston*, 482 U.S. at 461).

Here, Laney claims that Boyher pepper sprayed him in retaliation for vocalizing his objection to the BRT's treatment of female protesters.  But the evidence is undisputed that Boyher was nowhere near Laney when Laney approached the BRT lines and voiced his complaints.  In his opposition to defendants' motion for summary judgment, Laney admits that "[t]he evidence is clear that Defendant Boyher was not even in the area when Marks and Mr. Laney interacted."  (ECF 90 at p. 10.)  Boyher approached the BRT lines upon seeing Laney's physical altercation with Marks, and it is undisputed that it was this altercation that drew Boyher directly to Laney.  *Contra Molina v. City of St. Louis*, No. 4:17-CV-2498 AGF, 2021 WL 1222432, at *8 (E.D. Mo. Mar. 31, 2021) (qualified immunity denied on First Amendment claim where no evidence

suggested that plaintiff, who was shot in the hip with a tear gas cannister after

telling officers to leave, presented any threat to defendants).  There simply is no

evidence upon which a reasonable jury could conclude that Boyher pepper sprayed

Laney – even in part – because of his protected speech, let alone that a reasonable

officer would have understood that pepper spraying an agitated and threatening

person immediately after he had an altercation with a police officer and was still

engaged with that officer would violate that person's First Amendment right to

speak out.  *Steibel v. Locke*, No. 4:07CV2089 SNLJ, 2009 WL 1456705, at *9

(E.D. Mo. May 22, 2009) (plaintiff's rights not violated because he engaged in

confrontational, belligerent, and possibly threatening activity in addition to

protected conduct).  *See also Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)

("In brief, the plaintiff must show the official took the adverse action *because* the

plaintiff engaged in the protected speech." (emphasis added)).

Because Boyher is entitled to qualified immunity on Laney's First

Amendment free speech claim, I will grant summary judgment to Boyher on the

claim.

> b.    Freedom of Assembly

The undisputed evidence before the Court shows that Boyher pepper sprayed

Laney because of Laney's physical altercation with Marks after breaching the BRT

lines and Boyher's reasonable belief that, from his vantage point, the altercation

continued as he approached the scene.  As with Laney's free speech claim, there is no evidence from which a reasonable jury could conclude – or that a reasonable officer would have understood – that Boyher pepper sprayed Laney because of his mere participation with others in the *Stockley* protests.  *Steibel*, 2009 WL 1456705, at *9.  In these circumstances, it cannot be said that Boyher violated Laney's clearly established First Amendment right to freely and peaceably assemble. Boyher is therefore entitled to qualified immunity on this claim.

c.    Freedom of the Press

In his Second Amended Complaint, Laney claims that Boyher's actions violated his First Amendment right "to freedom of the press . . . by interfering with Plaintiff's ability to gather information and cover a matter of public interest." (ECF 45 at ¶ 63.)[3]  Although Boyher does not address the freedom of the press particularly in the motion for summary judgment, he contends generally that even if Laney was participating in protected First Amendment activity, his actions against Laney occurred as a reaction to the physical altercation between Laney and Marks and not because of Laney's exercise of his First Amendment rights.

There is no justification for official harassment of the press undertaken not for the purpose of law enforcement but to disrupt a reporter's relationship with his

---

[3] Other than this one-line assertion in the Second Amended Complaint, there is no indication or evidence in the record that Laney was acting as a member of the press during the events relevant to this case.

news sources. *Quraishi*, 986 F.3d at 838 (citing *Branzburg v. Hayes*, 408 U.S. 665, 707-08 (1972)). A reasonable officer would understand that deploying a chemical munition at law-abiding reporters is impermissible. *Id.* (citing *Anderson*, 483 U.S. at 640). As set out above, however, Boyher observed Laney in a physical altercation with a BRT officer during the BRT's attempt to clear a path on Tucker so that buses could leave the area. And, from Boyher's vantage point, Laney's confrontational engagement with the officer continued as Boyher approached the scene. In such circumstances, it cannot be said that a reasonable officer would understand that Laney was a law-abiding reporter or that pepper spraying Laney constituted official harassment of the press for no law enforcement purpose.

Boyher is thus entitled to qualified immunity to the extent Laney contends that his conduct violated his First Amendment right to freedom of the press.

B.   *Monell* Liability – Count 2

For § 1983 liability to attach to the City, a governmental entity, Laney must show that a constitutional violation resulted from an official municipal policy, an unofficial custom, or a deliberately indifferent failure to train or supervise. *Monell*, 436 U.S. at 691; *Mick v. Raines*, 883 F.3d 1075, 1079 (8th Cir. 2018). There can be no *Monell* liability without a constitutional violation by an individual officer. *Stockley v. Joyce*, 963 F.3d 809, 823 (8th Cir. 2020). An officer's immunity from suit, however, does not shield a city from liability for its policies. *Id.*; *Webb v. City*

*of Maplewood*, 889 F.3d 483, 486-87 (8th Cir. 2018).  Accordingly, even though Boyher is personally immune from suit on Laney's constitutional claims, the City may be held liable under § 1983 to the extent Laney's constitutional injury was caused by the City's alleged unconstitutional policies or customs, and/or lack of training and supervision.  *See Webb*, 889 F.3d at 486-87.

In Count 2 of his Second Amended Complaint, Laney claims that the following policies, practices, or customs of the SLMPD caused Boyher to violate his First and Fourth Amendment rights, thereby making the City liable under *Monell*:

a.   SLMPD officers' routine use of excessive force when policing protests, especially those at which police brutality is being protested;

b.   SLMPD's policy or custom of issuing vague and even contradictory dispersal orders without giving an opportunity to comply;

c.   SLMPD's policy of arbitrarily declaring unlawful assemblies in the absence of any threat or force or violent activity that provides no notice to citizens [of] unlawful conduct;

d.   Additionally, SLMPD has a custom, policy, or practice of violating the Fourth Amendment by regularly conducting unreasonable seizures and arresting individuals  without probable cause.

(ECF 45 at ¶ 70.)  Laney also claims that the SLMPD's inadequate training, supervision, and discipline of its officers with respect to their use of force caused the alleged constitutional violations.  (*Id.* at ¶ 71.)

- 17 -

1.    *Official Policy, or Custom or Practice*

In the context of § 1983 municipal liability, the term "policy" refers to "official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Corwin v. City of Independence, Mo.*, 829 F.3d 695, 700 (8th Cir. 2016) (internal quotation marks and citation omitted). "[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Board of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997). To establish liability based on "custom," Laney must demonstrate:  1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; 2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and 3) that he was injured by acts pursuant to the governmental entity's custom, *i.e.*, that the custom was a moving force behind the constitutional violation. *Johnson v. Douglas Cnty. Med. Dep't*, 725 F.3d 825, 828 (8th Cir. 2013). In short, Laney "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Board of Cnty.*

*Comm'rs of Bryan Cnty.,* 520 U.S. at 404.

As an initial matter, I note that the facts pleaded in Laney's Second Amended Complaint allege only that Boyher violated Laney's constitutional rights by pepper spraying him in the face without warning and that this unconstitutional conduct was the result of the City's pattern and practice of using chemical agents on individuals engaged in peaceful, non-criminal activity. (*See* ECF 45 at ¶¶ 27-53.) Because there are no factual allegations or evidence that the City's policies, customs, or practices relating to dispersal orders, unlawful assemblies, or arrests without probable cause resulted in injury to Laney, the City cannot be held liable on these claims. I will therefore grant summary judgment to the City on Laney's *Monell* claim as it pertains to dispersal orders, unlawful assemblies, and arrests without probable cause.

The City argues that Laney's *Monell* claim relating to unreasonable seizures is also inapplicable here because Laney was never arrested or detained. But arrest or detention is not required for a seizure to have occurred. *See Torres v. Madrid*, 141 S. Ct. 989 (2021). "[T]he application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued." *Id.* at 1003. Accordingly, viewing the record in a light most favorable to Laney, I construe Boyher's deployment of pepper spray to Laney's face as a "seizure" given that Boyher applied physical force to Laney's body with intent to

restrain him through temporary incapacitation, even though Boyher never gained physical control of him.  For the following reasons, however, the City is nevertheless entitled to summary judgment on Laney's *Monell* claim as it relates to seizures and use of force.  Because Laney claims that Boyher's use of pepper spray was excessive force that caused his seizure, the respective seizure and use-of-force aspects of Laney's claim are interrelated and will be discussed together.

In arguing that summary judgment is appropriate on Laney's *Monell* claim, defendants emphasize that the BRT is the only SLMPD unit at issue in this case, and that BRT officers have undergone multiple task-specific trainings since the BRT's creation in 2016 in addition to training that all SLMPD officers undergo. Defendants argue that the City's establishment of the BRT and its continual training of the unit shows its effort to create a new aspect of protest response that provides a "softer touch" to crowd management, demonstrating that the City is not deliberately indifferent to the changing circumstances surrounding protest activity over the past several years.

In his Second Amended Complaint and in response to defendants' summary judgment motion, Laney directs his argument on the municipal-liability claim to the SLMPD's repeated and demonstrated failure to comply with a settlement agreement reached in *Templeton v. Dotson*, Case No. 4:14CV2019 CEJ (E.D. Mo. 2015), as well as the SLMPD's failure to comply with and train on updated

- 20 -

chemical munitions policy the *Templeton* settlement brought about.  (*See* ECF 45 at ¶¶ 29-37, 73-76; ECF 90 at pp. 12-14.)  Laney argues that given the existence of the *Templeton* settlement agreement and resulting SLMPD policy, the known prevalence of the SLMPD's violations of the *Templeton* settlement agreement and policy, and the failure to remedy these violations, he has sufficiently demonstrated the City's deliberate indifference to the SLMPD's unconstitutional acts to such a degree that these acts manifest the City's policy, custom, and practice.

For the following reasons, the undisputed evidence before the Court shows that Boyher complied with the *Templeton* settlement agreement in the particular circumstances of this case.

In March 2015, the City entered into the *Templeton* settlement agreement whereby it agreed to the following provisions regarding the SLMPD's use of chemical agents, including pepper spray:

> A.    Defendants and their agents, servants, employees, and representatives, will not enforce any rule, policy, or practice that grants law enforcement officials the authority or discretion to:
>
> (1)    utilize tear gas, inert smoke, pepper gas, or other chemical agents (collectively, "chemical agents") for the purpose of dispersing groups of individuals who are engaged in non-criminal activity:
>
>> (a)  without first issuing clear and unambiguous warnings that such chemical agents will be utilized;
>> (b)  without providing the individuals sufficient opportunity to heed the warnings and exit the area;
>> (c)  without reasonably attempting to minimize the impact of such chemical agents on individuals who are complying with lawful

law enforcement commands; and

(d)  without ensuring that there is a means of safe egress from the area that is available to the individuals and announcing this means of egress to the group of individuals.

(2)     utilize chemical agents on individuals engaged in non-criminal activity for the purpose of frightening them or punishing them for exercising their constitutional rights.

B.     Provided, however, that Paragraph A hereof shall not be applicable to situations that turn violent and persons at the scene present an imminent threat of bodily harm to persons or damage to property, and when law enforcement officials must defend themselves or other persons or property against such imminent threat.

(Pltf.'s Exh. 15, ECF 83-15, *Templeton* Settlement Agreement.)  There is no dispute that Boyher's use of pepper spray here was not for the purpose of dispersing a group or groups of individuals but was used directly against Laney as an individual in response to his altercation with Marks.  Therefore, paragraph A(1) of the settlement agreement does not apply.  And assuming without deciding for purposes of paragraph A(2) that Laney was engaged in non-criminal activity at the moment Boyher sprayed him, the undisputed evidence shows that Boyher did not act for the purpose of frightening Laney or punishing him for exercising his constitutional rights, but rather because of Boyher's observation of a physical altercation between Laney and Marks that, from Boyher's visual perspective, continued and prevented the BRT from clearing a path on Tucker to enable the bus's exit.  Regardless, given Boyher's observations of the physical altercation that he described as a fight between Laney and Marks, paragraph B of the *Templeton*

- 22 -

settlement agreement permitted Boyher to forego the requirements of paragraph A.

Accordingly, because the undisputed facts show that Boyher's challenged conduct was consistent with the terms of the *Templeton* settlement agreement, Laney cannot base his claim against the City on a purported violation of the agreement that in fact did not occur.

2.    *Failure to Train, Discipline, and Supervise*

To establish § 1983 liability against the City for failure to train and supervise, Laney must show that:  1) the City's police officer training and supervision practices were inadequate; 2) the City was deliberately indifferent to the rights of others in adopting these training and supervision practices, and the City's failure to train and supervise was a result of deliberate and conscious choices it made; and 3) the City's alleged training and supervision deficiencies caused Laney's constitutional deprivation.  *See Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1061 (8th Cir. 2013) (citing *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996)).  For liability to attach, the identified deficiency in the City's training program "must be closely related to the ultimate injury."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989).  Thus, Laney must prove that the deficiency in training "actually caused" Boyher to violate Laney's constitutional rights.  *Id.*

Laney relies on various SLMPD officers' unfamiliarity with the *Templeton* case and its settlement agreement to argue that the City failed to adequately train or

retrain SLMPD officers on the use of reasonable force during protest activity and specifically the use of chemical agents during such activity.  For the reasons set out above, regardless of the training, supervision, and disciplinary practices of the SLMPD or the City, Boyher did not violate the terms of the *Templeton* agreement in the circumstances of this case and thus his conduct did not give rise to the constitutional deprivation Laney alleges.  Any difference in training, supervision, or disciplinary practices would not have yielded a different result.

Because Laney cannot establish an underlying constitutional violation in the circumstances of this case, I will grant summary judgment to the City on Laney's claim of municipal liability under § 1983.

C.    State-Law Claims – Supplemental Jurisdiction

In Counts 3-5 and 7, Laney raises State-law claims against Boyher and the City, and specifically, claims of assault, battery, and negligent and intentional infliction of emotional distress.  Boyher contends that he is entitled to official immunity on the claims.  The City argues that it is entitled to sovereign immunity. For the following reasons, I decline to exercise supplemental jurisdiction over the claims and will dismiss them without prejudice.

1.    *Supplemental Jurisdiction*

"[I] n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are

so related to claims in the action within such original jurisdiction that they form

part of the same case or controversy[.]" 28 U.S.C. § 1367(a).  Claims are part of

the same case or controversy if they "derive from a common nucleus of operative

fact." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164-65 (1997)

(internal quotation marks and citations omitted).  "A plaintiff's claims derive from

a common nucleus of operative fact if the 'claims are such that he would ordinarily

be expected to try them all in one judicial proceeding.'" *ABF Freight Sys., Inc. v.*

*Int'l Bhd. of Teamsters*, 645 F.3d 954, 963 (8th Cir. 2011) (quoting *United Mine*

*Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)).  Here, all claims share the

same "common nucleus of operative fact," form part of the same case or

controversy, and would ordinarily be adjudicated in a single judicial proceeding.

When supplemental jurisdiction exists under § 1367(a), the district court

may decline to exercise supplemental jurisdiction in certain circumstances:

> (c)  The district courts may decline to exercise supplemental
> jurisdiction over a claim under subsection (a) if —
>
> > (1)  the claim raises a novel or complex issue of State law,
> > (2)  the claim substantially predominates over the claim or
> > claims over which the district court has original jurisdiction,
> > (3)  the district court has dismissed all claims over which it has
> > original jurisdiction, or
> > (4)  in exceptional circumstances, there are other compelling
> > reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  Because I am granting summary judgment on and will

dismiss all claims over which the Court has original jurisdiction, I will decline to

exercise supplemental jurisdiction over the remaining State-law claims under subsection (c)(3).  Moreover, as set out below, I also decline to exercise supplemental jurisdiction over Laney's State-law claims against the City under subsection (c)(1) for the additional reason that the claims raise novel and complex issues of State law.

2.    *Novel/Complex Issue of State Law – City's Defense of Sovereign Immunity*

"[I]n the absence of an express statutory exception to sovereign immunity, or a recognized common law exception such as the proprietary function and consent exceptions, sovereign immunity is the rule and applies to all suits against public entities[.]"  *Metro. St. Louis Sewer Dist. v. City of Bellefontaine Neighbors*, 476 S.W.3d 913, 921-22 (Mo. banc 2016).

Missouri law provides three statutory exceptions to sovereign immunity, *see Martin v. Missouri Highway & Transp. Dep't*, 981 S.W.2d 577, 579 (Mo. Ct. App. 1998), where sovereign immunity is waived for torts arising out of:  1) the negligent operation of motor vehicles by public employees, *see* Mo. Rev. Stat. § 537.600.1(1); 2) injuries caused by the dangerous condition of public property, *see* Mo. Rev. Stat. § 537.600.1(2); or 3) when a political subdivision purchases liability insurance to cover tort claims other than those set out in § 537.600.1, in the amount of and for the purposes covered by the insurance purchased, *see* Mo.

Rev. Stat. § 537.610.1.[4]  *Hammer v. City of Osage Beach*, 318 F.3d 832, 841 (8th

Cir. 2003); *Brennan ex rel. Brennan v. Curators of Univ. of Mo.*, 942 S.W.2d 432,

434 (Mo. Ct. App. 1997).  Laney contends that the City is self-insured through its

relationship with the Public Facilities Protection Corporation (PFCP), whereby

funds paid by the City to PFPC are used to pay judgments against the City and its

employees.  Laney argues that with this self-insurance program, the City has

waived its sovereign immunity under § 537.610.1.

    In *Hendrix v. City of St. Louis*, Case No. 1722-CC01430 (22nd Judicial Cir.,

St. Louis City), the City moved for summary judgment on Hendrix's claims

against it for negligent training and supervision of its police officers, arguing that

sovereign immunity barred Hendrix's claims and that Hendrix could not show that

PFPC was an insurance plan to which § 537.610.1's waiver of sovereign immunity

applied.  The court agreed, finding that there was no genuine issue of material fact

---

[4] Section 537.610.1 provides:

> The commissioner of administration, through the purchasing division, and the governing body of each political subdivision of this state, notwithstanding any other provision of law, may purchase liability insurance for tort claims, made against the state or the political subdivision, but the maximum amount of such coverage shall not exceed two million dollars for all claims arising out of a single occurrence and shall not exceed three hundred thousand dollars for any one person in a single accident or occurrence, except for those claims governed by the provisions of the Missouri workers' compensation law, chapter 287, and no amount in excess of the above limits shall be awarded or settled upon. Sovereign immunity for the state of Missouri and its political subdivisions is waived only to the maximum amount of and only for the purposes covered by such policy of insurance purchased pursuant to the provisions of this section and in such amount and for such purposes provided in any self-insurance plan duly adopted by the governing body of any political subdivision of the state.

"that the PFPC is not a policy of insurance purchased pursuant to Section 537.610 nor is it a self insurance plan adopted by the governing body." (Defts.' Exh. F, ECF 73-8, at p. 5.)  After the case proceeded to trial against individual police officers and the jury returned a split verdict, each side appealed. *See Hendrix v. City of St. Louis*, Case No. ED108858 (Mo. Ct. App.).  The matter remains pending before the Missouri Court of Appeals.  *Id.*

Laney admits that "neither the Missouri Supreme Court nor the Missouri legislature has defined self-insurance" (ECF 90 at p. 17), but he argues that the City's involvement with the PFPC fits within the parameters of self-insurance programs as described by the Supreme Court of Connecticut and the Eighth Circuit Court of Appeals.  (*Id.* at pp. 17-18.)  Laney also points to several cases from this Court that have found plaintiffs' allegations of self-insurance under the PFPC to withstand motions to dismiss.  (*See id.* at p. 18, n. 3.)  The standard for dismissal is very different from the standard for summary judgment, however.  I consider a motion to dismiss based on the pleading itself; a motion for summary judgment requires the parties to provide evidence in support of and in opposition to the motion.  Regardless, both Laney and the City ask me to definitively rule – one way or the other – as to whether the City's participation in the PFPC program constitutes self-insurance under the Missouri statute.

This issue is one of first impression under Missouri law and requires

interpretation of Missouri statutes.  As Laney admits, Missouri appellate courts

have not addressed this issue, nor have they interpreted the relevant statutes as they

relate to the City's participation in the PFPC program.  Federal courts, as a matter

of comity, should not venture to interpret State laws in the absence of guidance

from state appellate courts.  *See Fielder v. Credit Acceptance Corp.*, 188 F.3d

1031, 1038 (8th Cir. 1999) ("[N]ovel, complex, and important issues of state law

on which the [state] appellate courts have given us little or no prior guidance . . .

are precisely the types of issues as to which federal courts should hesitate to

exercise § 1367 supplemental jurisdiction.").  *See also Women Prisoners of Dist. of*

*Columbia Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 921-23 (D.C. Cir.

1996) (district court abused its discretion by retaining supplemental jurisdiction

over a novel issue of state law) ("'[P]rinciples of comity and the desirability of a

surer-footed reading of applicable law support the determination of state claims in

state court.  Determination by the state court is especially important where the case

involves novel and unsettled issues of state law.'") (quoting *Grano v. Barry*, 733

F.2d 164, 169 (D.C. Cir. 1984)).  Because the viability of Counts 3-5 and 7 against

the City rests upon the interpretation of Missouri law that Missouri appellate courts

have not yet undertaken, I decline to exercise supplemental jurisdiction over these

claims under 28 U.S.C. § 1367(c)(1).

　　　　Accordingly, pursuant to 28 U.S.C. § 1367(c)(3), I decline to exercise

supplemental jurisdiction over Laney's State-law claims raised against defendant Boyher in Counts 3-5 and 7.  Pursuant to 28 U.S.C. § 1367(c)(1) and (c)(3), I decline to exercise supplemental jurisdiction over these claims as to the City.

E.    Novel Claim Under City Charter

In Count 8, Laney asserts that defendants Deeken, the Director of Public Safety, and O'Toole, the then-acting Chief of Police, are vicariously liable for all of defendant Boyher's alleged misconduct by virtue of Article VII, Section 5 of the Charter of the City of St. Louis.  Section 5 reads:  "Each head of a department, office or division shall be responsible for the acts or omissions of officers and employees appointed by him, and may require bonds or other securities from them to secure himself."  Charter, Art. VII § 5.  Section 5 of the Charter has been in effect since 1914.  Despite many cases filed since then alleging police use of excessive force or other police misconduct, neither the parties nor the Court can identify a single instance in which Section 5 has been held by a Missouri court to impose vicarious liability for the acts of police officers such as is alleged here. Because this State-law/City-Charter claim raises novel and complex issues, I will exercise my discretion and decline to consider it, as allowed by 28 U.S.C. § 1367(c)(1).

Laney's claim raises statutory construction issues and conflict-of-law questions that would be more appropriately resolved first by Missouri state courts.

For example, defendants have asserted defenses that would require this Court to assess such matters as 1) the precise contours of Missouri law regarding officials' vicarious liability; 2) whether and to what extent Section 5 conflicts with Missouri law; 3) whether Missouri law preempts the Charter; and 4) the effects of preemption on the validity of the Charter itself. *See Missouri Bankers Ass'n, Inc. v. St. Louis Cnty.*, 448 S.W.3d 267, 272 (Mo. banc 2014); *Coop. Home Care, Inc. v. City of St. Louis*, 514 S.W.3d 571, 578 (Mo. 2017). This Court is not the proper forum to litigate complex and unsettled questions of State-law preemption over obscure municipal ordinances. I therefore decline to exercise supplemental jurisdiction over Count 8 and will dismiss the claim without prejudice.

## Conclusion

For the reasons set out above, defendant Lt. Scott Boyher is entitled to qualified immunity on plaintiff Derek Laney's claims that Boyher violated his First and Fourth Amendment rights, as set out in Counts 1 and 6 of the Second Amended Complaint, and these claims are dismissed with prejudice. Defendant City of St. Louis is entitled to summary judgment on plaintiff Laney's § 1983 claim of municipal liability under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), as set out in Count 2 of the Second Amended Complaint, and this claim is dismissed with prejudice. Pursuant to 28 U.S.C. § 1367(c)(1) and (c)(3), I decline to exercise supplemental jurisdiction over plaintiff

Laney's State-law claims raised in Counts 3-5 and 7 of the Second Amended Complaint, as well as the City-Charter claim raised in Count 8.  These claims are dismissed without prejudice.

Accordingly, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that defendants' Motion for Summary Judgment [72] is **GRANTED** as to Counts 1, 2, and 6 of plaintiff's Second Amended Complaint.

**IT IS FURTHER ORDERED** that supplemental jurisdiction under 28 U.S.C. § 1367 is declined over Counts 3-5, 7, and 8 of plaintiff's Second Amended Complaint; and Counts 3-5, 7, and 8 are dismissed without prejudice.

A separate Judgment and Order of Dismissal is entered herewith.



_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


Dated this 28th day of September, 2021.